UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

SHAWN LUCIDI,

                                        Plaintiff,


                    v.                                          6:02-CV-1284
                                                                (J. Mordue)

COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.

_____

APPEARANCES:                              OF COUNSEL:

SHAWN LUCIDI
Plaintiff pro se

GLENN T. SUDDABY                          WILLIAM H. PEASE
United States Attorney for the            Assistant U.S. Attorney
Northern District of New York
Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

   This matter was referred to me for report and recommendation by the Honorable

Norman A. Mordue, United States District Judge,  pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).  This case initially proceeded in accordance with General Order

18, however, plaintiff did not file a brief.  Mail addressed to plaintiff at his last known

address has been returned as undeliverable on *five* occasions, beginning on April 7,

*2003.* (Dkt. Nos. 10, 11, 15, 17, 20).

   Because plaintiff failed to file a brief in accordance with General Order 18, I

issued an order on June 28, 2004, requiring defendant to file a brief in support of the

Commissioner's position. (Dkt. No. 16).  Defendant filed a brief on September 28,

2004. (Dkt. No. 21).

## PROCEDURAL HISTORY

On September 12, 1989, plaintiff filed an application for Disability Insurance

Benefits (DIB) and Supplemental Security Income (SSI) Benefits, claiming disability

as of January 1, 1982. (T. 39-41).  The applications were denied initially and on

reconsideration.[1] (T. 42-52, 54-58).  Plaintiff requested a hearing before an

Administrative Law Judge (ALJ).  A hearing was held on November 9, 1990.[2]  On

February 1, 1991, ALJ Joseph G. Medicis, Jr. issued a decision in which he found that

plaintiff had ***not*** shown that he became disabled prior to June 30, 1983, the expiration

of his insured status for purposes of DIB, however, ALJ Medicis also found that

plaintiff had shown that he was disabled as of September 12, 1989 (the date of the

application) for purposes of SSI benefits. (T. 148-52).  Thus, plaintiff began receiving

---

[1] There is no dispute that plaintiff applied for both DIB and SSI on September 12, 1989. However, it also appears that there is a previous application for DIB in the record dated in 1981. (T. 156-60).  This application was signed on plaintiff's behalf by the Records Coordinator of the Devereux Foundation, where plaintiff was in residential treatment at the time.  There is no mention of this application anywhere else in the record.  It does not appear that plaintiff's 1989 application is in the record.  It appears from later documents that the 1981 application was denied because plaintiff was not insured at the time. (*See* T. 54).

[2] The transcript of this hearing is not in the record and is not relevant to this case.  The date of the hearing was obtained from the ALJ's decision, in which he stated the date that he held the hearing. (T. 148).

SSI benefits with an onset date of September 12, 1989.

Pursuant to the settlement in a federal court class action, *Stieberger v. Sullivan*, 792 F. Supp. 1376 (S.D.N.Y. 1992), *modified by*, 801 F. Supp. 1079 (S.D.N.Y. 1992), the denial of plaintiff's 1989 application for DIB was reopened on October 31, 2000. (T. 187-98). Plaintiff's claim was reviewed under the terms of the settlement, and it was determined that plaintiff was not under a disability during the relevant time period. (T. 199-200). Plaintiff was notified of the determination and requested a hearing before an ALJ.[3] (T. 202). A hearing was held on March 6, 2002 before ALJ John R. Tarrant. (T. 20-36). On May 1, 2002, Judge Tarrant issued a decision, denying plaintiff's claim. (T. 10-17). Judge Tarrant's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on August 9, 2002.

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

[3] Pursuant to the *Stieberger* settlement, if the class member had no active disability claim pending (as plaintiff in this case), then the plaintiff's claim would be reopened at the reconsideration level. *Stieberger*, 792 F. Supp. at 1386 (App. A § 10(e)(2)). Thus, after the claim was denied at the reopening or reconsideration level, plaintiff had the opportunity to request a hearing.

expected to last for a continuous period of not less than twelve months ...." 42 U.S.C.

§ 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that [he] is not only unable to do [his] previous work but cannot,
> considering [his] age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area in
> which [he] lives, or whether a specific job vacancy exists for [him], or
> whether [he] would be hired if [he] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520

and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If [he] is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits [his] physical or mental ability to basic work
> activities.  If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an
> impairment which meets or equals the criteria of an impairment listed in
> Appendix 1 of the regulations.  If the claimant has such an impairment,
> the [Commissioner] will consider [him] disabled without considering
> vocational factors such as age, education, and work experience; ... .
> Assuming the claimant does not have listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, [he] has the
> residual functional capacity to perform [his] past work.  Finally, if the
> claimant is unable to perform [his] past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.[4]

---

[4] The court notes that in September of 2003, a revised version of these two sections came into
effect. *See* 68 Fed. Reg. 51161, 51164 (Aug. 26, 2003).  A new section was added that clarified the
application of the Residual Functional Capacity (RFC) determination. 20 C.F.R. §§ 404.1520(e), 416.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 1.  Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v.*

---

920(e).  The former sections (e) and (f) are now sections (f) and (g).  These revisions do not affect the Five Step disability determination sequence and have no effect on the outcome of this case.

*NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

The *Stieberger* settlement provides that in cases reopened pursuant to the agreement, the Commissioner shall develop the record and make the disability determination in accordance with the above regulations. 801 F. Supp. at 1091-92 (Settlement Agreement (SA) at § 10(e)).

## 2.    **Background**

The *Stieberger* class action was brought in 1984 to challenge the alleged practice of the Secretary of Health and Human Services of non-acquiescence in decisions of the United States Court of Appeals for the Second Circuit. *See Shields v. Comm'r of Social Security*, 04 Civ. 1845, 2005 U.S. Dist. LEXIS 794, *3-4 (S.D.N.Y. Jan. 19, 2005). The settlement provided for the reopening and review of claims meeting certain criteria. *Id.* at *6. Among the claims subject to reopening were those that were denied or terminated for lack of disability at the ALJ or Appeals Council level between October 18, 1985 and July 2, 1992. *Id.* There is no question that this

plaintiff met the criteria for reopening since his 1989 DIB application was denied by

ALJ Medicis on February 1, 1991. (T. 152).

The *Stieberger* settlement also provided for procedures by which the claims

would be reviewed, including directions as to how and for what period of time the

record would be developed so that a proper determination could be made. *See* 801 F.

Supp. 1091-92 (SA at § 10(e)).  In this case, plaintiff's 1989 DIB application claimed

disability with an onset date of January 1, 1982.  Plaintiff's insured status expired on

June 30, 1983. (T. 13).  Although ALJ Medicis found that plaintiff had not established

disability for purposes of DIB because he had not shown that he was disabled between

January 1, 1982 (claimed onset date) and June 30, 1983 (expiration of insured status),

the ALJ did find that plaintiff was disabled for SSI purposes with an onset date of

September 1, ***1989***. (T. 148-52).

According to the *Stieberger* settlement, the Commissioner must develop the

record for a four year period preceding the date that the Social Security

Administration received the request for reopening. 801 F. Supp. at 1091 (SA at § 10(e)

(4)).  This is referred to as the "Development Period".  The agreement also provides

that in computing this four year period, the agency shall not count any time for which

the person received disability benefits. *Id.*  In this case, the request for reopening was

made in 2000, but since plaintiff had already been found disabled as of September 1,

1989, the four year period began to run on September 1, 1989.  Thus, the

Development Period for this plaintiff began on September 1, 1985.

Since *Stieberger* provided for the review of cases that were both pending and those that had been finally denied years prior to *Stieberger*, the insured status of many of the class members had expired.  Additionally, even if found disabled, plaintiffs would only be entitled to a certain amount of retroactive payment.  Because of this, *Stieberger* provided for the calculation of "presumed" onset and "presumed" insured dates.  The Office of Hearings and Appeals of the Social Security Administration has a legal manual in which all the *Stieberger* provisions, together with the rules that the agency will use in processing the claims are published. Office of Hearings and Appeals HALLEX (Hearings, Appeals and Litigation Law Manual).  The first volume of the HALLEX contains a section entitled "Temporary Instructions".  This section or "Division" as it is referred to in the HALLEX contains a Chapter entitled "Court Cases". HALLEX, I-5-4.  Within this chapter are the instructions for processing *Stieberger* claims. *Id.* HALLEX, I-5-4-13.

### A.  ALJ Tarrant's Decision

Pursuant to the directions contained in the *Stieberger* settlement agreement, ALJ Tarrant first calculated the relevant dates for plaintiff's Development Period and presumed insured status date. (T. 13).  The ALJ stated that plaintiff's development period began on September 1, 1985 and if plaintiff showed that he was disabled as of the first month of the Development Period, his insured status would be presumed as of

8

April 1, 1988. (T. 13, 161).  If plaintiff could not make this showing, he would still be entitled to show that was disabled as early as the alleged onset of disability of January 1, 1982[5] until his insured status expired on June 30, 1983. (T. 13).

After a review of the record, ALJ Tarrant found that plaintiff suffered from physical impairments that limited him to sedentary work. (T. 14).  Plaintiff also claimed limitations due to mental impairments, however, the ALJ found for the period in question and until October of 1989, that these limitations were caused by alcohol abuse, not plaintiff's personality disorder. *Id.*  The ALJ found that because the limitations were secondary to substance abuse, they would not be considered pursuant to the regulations. (T. 15).  Since plaintiff was physically capable of sedentary work, and the ALJ found that without the limitations posed by the substance abuse, there were no other limitations that would have prevented plaintiff from working, the plaintiff would not be under a disability at any of the relevant periods covered by the *Stieberger* settlement. (T. 15-16).

The court must now determine whether the ALJ's decision is supported by substantial evidence.

**3.    Relevant Dates**

I note that there need be no extended discussion of whether the Commissioner was correct in calculating the relevant dates in this action since the ALJ reviewed the

---

[5] This was the date plaintiff alleged as his onset of disability in his 1989 application.

medical evidence and covered the entire time period between plaintiff's prior onset date of January 1, 1982 and the time that plaintiff was found disabled for SSI purposes in 1989.  The ALJ basically found that plaintiff had not established disability during the entire period, or prior to any of the presumed dates, the first month of the Development Period, September 1 through September 30, 1995 or prior to April 1, 1988 the presumed insured status expiration date.  The ALJ also found that plaintiff was not disabled between January 1, 1982 and the expiration of plaintiff's actual insured status on June 30, 1983.

There is no indication that the Commissioners calculations are in error although the calculation of the dates becomes confusing when one considers the fact that plaintiff was found disabled as of September of 1989, and that during the period in question, he was incarcerated which would also affect the calculation.

**4.** **Medical Evidence**

**A. Prior to June 30, 1983**

There is no question that plaintiff has always had mental as well as a physical impairment.  In April of 1979, plaintiff was evaluated at the Devereux Foundation where he was later admitted for residential treatment in the Foundation's Vocational Rehabilitation Center. (T. 118-40).  Plaintiff's initial evaluation was conducted by both a psychologist, Dr. Thomas Blash, Ph.D. and a psychiatrist, Dr. Solomon Littman, M.D. (T. 118-23, 124-26).

10

Dr. Littman noted that in 1978, plaintiff had a long history of psychological problems and in 1977 and 1978 he was prescribed anti-depressant medication for "psychotic depression." (T. 124).  In 1978, plaintiff was admitted to the Elmira Psychiatric Center for three months with schizophrenic episodes, however, he showed gradual improvement through medication and other therapy. (T. 124).  Plaintiff told Dr. Littman that he had not been on medication for approximately four months, and could not remember which medication he had been taking. (T. 124).

Plaintiff stated that he had difficulty in school and dropped out in the tenth grade, but expressed to Dr. Littman that plaintiff wished to get an equivalency diploma (GED). (T. 125).  Dr. Littman stated that neurologically, there were no signs to support a diagnosis of primary organic difficulty. (T. 125).  Plaintiff 's abstract thinking was satisfactory and his sensorium was correct in all three spheres. *Id.* Plaintiff admitted that one year earlier he had heard voices, but realized that these "messages" came from his own head. *Id.*  He admitted that he felt depressed in the past, and still had some depressive feelings. (T. 125).

Dr. Littman concluded that plaintiff was "in good clinical condition" at the time, although he had "seemingly" suffered a schizophrenic break which was "well compensated" and "well in remission." (T. 126).  Dr. Blash reviewed various psychological tests that plaintiff had taken and conducted his own interview of plaintiff. (T. 118-23).  Dr. Blash concluded that plaintiff was "formerly" incapacitated

11

with "what was probably" a schizo-affective disorder, his general view of life was negative, and he had a strong desire to remain a youngster. (T. 122).  Dr. Blash stated that plaintiff had a great deal of narcissistic injury, had damaged object relations, suffered from denial, distortion, externalization, avoidance, passive aggression, and overactive fantasy. (T. 122).  Dr. Blash stated that plaintiff had elements of paranoid disposition at times with accompanying depression. *Id.*

As a result of these interviews, plaintiff was admitted to the Devereux Foundation's Vocational Rehabilitation Program, where he stayed in the residential program until he was discharged in 1981.  During his stay at the Devereux Foundation, plaintiff was periodically evaluated, and the reports are signed both by psychologists and by Dr. Littman.  In May of 1980, Dr. David Ellis, Ph.D. reported that plaintiff was having trouble with daily attendance and completing academic assignments. (T. 128).  Plaintiff was working in a sheltered workshop, and Dr. Ellis noted that plaintiff's production depended on his "motivation." (T. 128).  Plaintiff's diagnosis was schizophrenia, schizoaffective type. (T. 129).  The goals stated in Dr. Ellis's report were to have plaintiff obtain and keep an "outside job," and discharge from the Foundation to "home and community." (T. 130).

On December 10, 1980, Dr. Ellis reported that plaintiff had improved "a great deal" in the residence. (T. 132).  There were no medications noted at that time, and the goals set for plaintiff were the same. (T. 133).  Plaintiff was discharged from the

program on June 20, 1981.  On May 8, 1981, Dr. Littman noted that plaintiff had

continued clinical improvement, although he had a depressive episode in early 1981

due to his adoptive mother's medical problems. (T. 138).  At the time, plaintiff was

working in the pewter shop and seemed satisfied with his work. (T. 138).  Plaintiff had

a reasonable sense of trust in his friends, no signs of psychosis, no hallucinations, no

paranoid ideation, and no high level of suspiciousness. (T. 138).  Dr. Littman's

diagnosis was affective disorder with episodes of depression, "now in remission." *Id.*

Dr. Littman's discharge summary stated that plaintiff's prognosis was "fair" and

that although he had a depressive episode regarding his mother's health problems, he

was able to recuperate fairly well and adjust again in a relatively short period of time.

(T. 140).  Plaintiff had passed the GED exam and was "socially well functioning." *Id.*

Plaintiff was taking the antidepressant, Tofranil at the time.

Plaintiff began treatment at the Tompkins County Mental Health Clinic (the

Clinic) on November 8, 1981. (T. 89-90).  On November 8, 1981, plaintiff was

referred to the Clinic by his attorney when plaintiff failed to cooperate with a pre-trial

diversion program as an alternative to prosecution for minor theft. (T. 89).  Plaintiff's

intake interview revealed that he was cooperative and relaxed, although his

appearance was somewhat immature.  His mood and affect were "bland" but his

sensorium and intellect were "average." (T. 89).  The reviewers noted that plaintiff

lacked insight equivalent to his intelligence, and his judgment was "adequate" but

13

"unelaborated." (T. 89).  Plaintiff was diagnosed with a dependent personality

disorder. (T. 89).  Plaintiff's case was closed in June of 1983. (T. 90).  His treatment

had consisted of four individual sessions between November of 1981 and January of

1982 as well as group therapy from February 1982 until June 1982. (T. 90).  The

closing summary indicates that plaintiff had become more "actively interactive" and

expressive of his feelings during his treatment period. *Id.*  He remained rather

withdrawn and quite immature.  However, he quit therapy because he obtained a job

that he obtained through the Office of Vocational Rehabilitation. (T. 90).

### B.  Evidence After June 30, 1983

The rest of the medical evidence in plaintiff's case is subsequent to the actual

expiration of plaintiff's insured status.  On January 1, 1984, plaintiff was treated at the

Clinic on an "emergency" basis. (T. 91).  The Clinic notes state that plaintiff was a

"former" clinic client, and that he had come to the clinic on January 31, 1984 because

he had lost control during an argument with his girlfriend and admitted hitting her. *Id.*

Although the initiative for the Clinic appointment came from plaintiff's girlfriend,

plaintiff told the interviewer that he wished to avoid future physical confrontations. *Id.*

The Clinic diagnosis was "Interpersonal Problems."  Although the report is apparently

signed by a therapist and a medical doctor, their signatures are illegible. (T. 91).

Plaintiff was apparently only seen once for this problem. (T. 92).  The record contains

evidence of plaintiff's hospitalization on May 19, 1986 for an alcohol and drug

14

overdose. (T. 265-67).  The diagnosis was voluntary overdose and "character

disorder." (T. 265).  The report noted plaintiff's heavy use of alcohol and marijuana.

(T. 267).

Plaintiff was subsequently incarcerated, and on July 28, 1986 plaintiff was

taken to the Clinic for evaluation at the request of the jail staff. (T. 94-95).  The July

28, 1986 report[6] stated that  plaintiff had a "history" with mental health agencies,

dating back to 1969 and had been diagnosed as "hyperactive" as a child.[7]  The report

noted that plaintiff was facing various legal charges, including a charge involving

theft of a car, resulting in a high speed chase, possession of a forged instrument, and

probation violation. (T. 94).  The report stated, however, that the legal charges in the

past were "alcohol and drug related." *Id.*

The report also noted that during his incarceration, plaintiff's mood was

somewhat depressed, and he had conflicts with other inmates resulting in placement in

a single cell for his own safety. *Id.*  The report stated that the isolation may have

contributed to his depression. *Id.*  Plaintiff's thinking was logical and goal-directed, no

evidence of a thought disorder, and no suicidal ideation. (T. 95).  Plaintiff

acknowledged his alcohol and marijuana problem.  The first diagnosis listed in the

---

[6] The report is again, co-signed by Cindy Foster-Clark, CSW and a medical doctor whose signature is illegible.

[7] Plaintiff was born in 1960, so he was only nine years old in 1969.

report was Alcohol Abuse, and the second diagnosis was Atypical P.D. (personality disorder). (T. 95).

The next report from the Clinic is dated September 2, 1996 and indicates that since plaintiff left jail, he was "dealing much better" with "the situation." (T. 93). He had accepted responsibility for his legal situation and acknowledged his alcohol and drug problem. He had been returned to General Population prior to leaving jail and had made satisfactory adjustment. He had been released from jail to participate in the Dick Van Dyke Alcohol Treatment Center program. Plaintiff's Axis I diagnosis was still Alcohol Abuse, and the Axis II diagnosis was Atypical Personality Disorder.

Plaintiff was next treated at the Clinic on July 14, 1988. (T. 96-97). The intake report states that plaintiff *had* a drinking problem, but had maintained sobriety since mid-86. (T. 96). However, the next sentence states that plaintiff "now wants to stop use of pot." *Id*. Plaintiff's stated goals were to avoid developing substance dependencies and become financially independent. (T. 96). Plaintiff wanted to start attending a community college, but if he could not, he wanted to start working full-time. *Id.*

Another report, entitled "Initial Treatment Plan", written by a physician on the same day (July 14, 1988) states that plaintiff's first diagnosis was Cannabis Abuse, his second diagnosis was Alcohol Abuse, in remission, and his third diagnosis was Personality Disorder. (T. 97). The doctor stated that for years plaintiff had been

16

unable to maintain a responsible and self-sufficient life style, but that "[a]lcohol, and more recently marijuana abuse have been *major factors*." *Id.*  Plaintiff was discouraged about his abilities and never learned to handle emotional pain, but his strengths included average or better intelligence, an ability to understand himself and others, and a lack of violent tendencies. *Id.*  The doctor's plan was individual and group therapy "aimed at eliminating substance abuse", building self-esteem, and requiring plaintiff to develop responsibility and helping him learn to handle emotional pain. (T. 97).  As late as February 14, 1989, plaintiff's diagnosis was Cannabis Abuse. (T. 98).

It was not until the assessment of psychiatrist Dr. Albert K.C. Chen, (T. 104), in October of 1989 that plaintiff's main diagnosis was not some kind of substance abuse. (T. 102-103).  Dr. Chen was a consulting physician.  Dr. Chen reviewed plaintiff's history of impairment and history of incarceration. (T. 102).  Dr. Chen noted that plaintiff "resorted to drug and alcohol abuse heavily." *Id.*  Dr. Chen also stated that plaintiff told the doctor that he had been sober for the last ten months. (T. 103).  Dr. Chen diagnosed Anxiety Disorder, Schizoid Personality, and Alcoholism/Substance Abuse. (T. 103).

In September of 1990, plaintiff started seeing psychiatrist Dr. Robert E. Hamlisch. (T. 113-16).  On November 8, 1990, Dr. Hamlisch wrote a report indicating that plaintiff had a "recurring" major depression and that his daily functioning was

retarded, he had "vegetative" signs, and his sleep and eating patterns were disturbed. (T. 113). Dr. Hamlisch indicated that he had started plaintiff on medication therapy as of October 4, 1989. *Id.* There is another statement that appears to refer to plaintiff having "minimal" abilities consistent with employment and adult autonomous functioning.[8] Plaintiffs affect was blunted and his thinking was slowed because of the depression. *Id.* His orientation to person, place, and time was good, but his suicidal ideation ranged from low to moderate. (T. 113). Dr. Hamlisch's diagnosis was Axis I, Major Depression, recurrent and severe, but without psychotic features; Axis II was deferred; and Axis III was a chronic hip problem. (T. 114).

Dr. Hamlisch concluded that plaintiff's prognosis for restoring daily functioning was "good", however, the prognosis for his ability to function at standards requisite for "normal" employment was "poor" to "unknown at this time." (T. 114). Dr. Hamlisch completed a Residual Functional Capacity (RFC) Evaluation, indicating moderately severe to severe restrictions in ***all*** categories of functioning. (T. 115-16). It was based upon Dr. Chen's and Dr. Hamlisch's evaluations that ALJ Medicis found that plaintiff was under a disability and eligible for SSI as of September 12, 1989, the date of his application. (T. 150-51).

---

[8] I say "appears" because a few key words in the doctor's sentence are illegible, however, it appears from the rest of his report that plaintiff would be unable to work.

Plaintiff's physical problem was a "slipped epiphysis"[9].  This referred to a dislocation in plaintiff's hip for which he had surgery when he was fourteen years old. (T. 106).  There are two medical reports regarding plaintiff's hip. (T. 99-100, 106-107).  Plaintiff re-injured his hip in March of 1989 when he was moving some weights at the jail. (T. 99).  In May of 1989, plaintiff saw Dr. Bruce Stewart, an orthopedic surgeon. (T. 99).  Dr. Stewart's report indicates that plaintiff had not had "much [sic] interval symptoms" since the surgery. *Id.*  The doctor recommended that when plaintiff got out of prison, he perform work that was "fairly sedentary" and told him to avoid work that kept him on his feet "all day long." *Id.*

On November 22, 1989, plaintiff was examined for his hip by Dr. William McAuliffe, a general surgeon. (T. 106-07).  Dr. McAuliffe stated that plaintiff had a permanent partial disability and could not work in a job that required ***prolonged*** walking or standing and could not lift and carry more than 25 pounds.

## 5.   **Alcohol and Drug Abuse**

There is no question that plaintiff in this case has a serious mental impairment, and he was found to have been disabled by this impairment as of September 12, 1989, however, plaintiff's insured status for DIB expired on June 30, 1983 and was thus, not eligible for those benefits.  However, his case was reviewed pursuant to *Stieberger*,

---

[9] The "epiphysis" is the end of a long bone, such as the femur. DORLANDS MEDICAL DICTIONARY 248 (Shorter Ed.1980).  A "slipped epiphysis" is a dislocation of the epiphysis of the bone. *Id.*

and he had the opportunity to show that he was disabled during specific later periods of time as well as another opportunity to show that he was disabled prior to the expiration of his insured status in 1983. ALJ Tarrant found that although plaintiff was severely limited by his mental impairments during this time, the limitations were due to alcohol and drug abuse and thus, could not be considered. Since there was no evidence prior to 1989 that plaintiff would have been disabled by his mental impairment without the limitations imposed by the drugs and alcohol, ALJ Tarrant found that plaintiff was not under a disability as of any of the recalculated or original dates.

The Social Security statute itself provides that a claimant will not be considered to be disabled if alcoholism or drug addiction would be a contributing factor ***material to the Commissioner's finding that the individual is disabled***. 42 U.S.C. §§ 423(d)(2)(C), and 1382c(a)(3)(J). The plaintiff must first be found to have limitations that would constitute disability. *Frederick v. Barnhart*, 317 F. Supp. 286, 290 (W.D.N.Y. 2004). The key factor in making the determination of materiality is whether the plaintiff would still meet the definition of disability if he stopped using alcohol. *Id.* (citing 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2)).

When there is evidence of alcoholism, the Commissioner must identify what physical and mental limitations would remain assuming the plaintiff did not use alcohol. *Id.* If the remaining limitations would not be disabling, then alcoholism

20

would be a "material" factor, and the plaintiff will not be entitled to benefits. *Id.* The burden is on the plaintiff to show that alcoholism is not a contributing factor, material to the disability finding. *Id.*

A review of the medical evidence in this case shows that for all the relevant periods, plaintiff's main diagnosis was of alcohol and drug abuse, notwithstanding his long history of mental issues. It is true that when he was 18 years old, he was in residential vocation treatment at the Devereux Foundation, however, he was released and the program was terminated in June of 1981 with "continued clinical improvement." (T. 140). Although he had a bout of depression before he left the program due to his mother's medical problems, Dr. Littman stated that plaintiff was able to recuperate fairly well and adjust again in a short period of time. (T. 140). By the time he left Devereux, plaintiff had passed his GED examination and was "socially well-functioning." *Id.* In any event, plaintiff did not even claim disability until January 1, 1982.

All the following medical records indicate that plaintiff's ***main problem*** was his alcohol and drug abuse. In fact, after his release from the Devereux Foundation, plaintiff's medical records did not commence again until his "emergency" admission in January of 1984 when he was diagnosed with "interpersonal problems" because he had an altercation with his girlfriend. (T. 91). The case was closed after one session because plaintiff did not want further clinic services. *Id.* The next medical records are

from the Tompkins County Clinic and are dated in 1996, when plaintiff was in jail. (T. 93).  However, the records indicate that plaintiff had begun to abuse alcohol and drugs, and that plaintiff's legal problems were caused by the substance abuse. (T. 93-95).  Even after plaintiff had attempted to stop drinking, as a 1988 Clinic report indicated, he was still abusing marijuana, and that was noted as the ***major*** factor in his inability to maintain responsibility and a self-sufficient lifestyle. (T. 96-97).  Thus, all plaintiff's medical records, most of which were created while plaintiff was incarcerated, refer to his alcohol and drug dependence. (*See* T. 93-97).  Even if these reports mention his "Atypical Personality Disorder," they do so only briefly, and they never mention any functional limitations based upon the personality disorder.  Thus, the ALJ's finding that plaintiff would not have been disabled if not for his alcohol and drug dependence during the relevant time periods[10] is supported by substantial evidence.  Additionally, the ALJ's finding that plaintiff could perform the full range of sedentary work is also supported by substantial evidence, and the Commissioner's decision should be affirmed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the Commissioner's decision be **AFFIRMED** and the complaint **DISMISSED.**

---

[10]  The relevant time periods are from January of 1982 and June 30, 1983 or between September 1, 1985 and September 30, 1985 or anytime prior to April 1, 1988 until he was found disabled as of September 12, 1989.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  The objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Svcs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 29, 2005

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge